Armand **MACCHIAVELLI**, Plaintiff,

v.

**SHEARSON, HAMMILL & CO., INCORPORATED, a Delaware corporation, Does I through C, Defendant.**

Civ. No. S-2593.

United States District Court, E. D. California.

Oct. 15, 1974.

Robert E. Proaps, Jr., Proaps, Gregor & Brophy, Sacramento, Cal., for plaintiff.

Chester· A. Skinner and Arthur L. Sherwood, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant.

## MEMORANDUM AND ORDER

MacBRIDE, Chief Judge.

■   Armand Macchiavelli ˙ (hereafter plaintiff) an investor in stocks, files this complaint against Shearson, Hammill & Co. Incorporated (hereafter defendant), a stock brokerage firm and several Does, alleging two causes of action.  Initially, it should be noted that there is no provision in the Federal statutes or Federal Rules of Civil Procedure for use of fictitious parties.  The Ninth Circuit has consistently rejected the inclusion of "Does" in the complaint and we do the same here.  Fifty Associates v. Prudential Insurance Co., 446 F.2d 1187 (9th Cir. 1970); Craig v. United States, 413 F.2d 854 (9th Cir. 1969); Molnar v. National Broadcasting Corporation, 231 F.2d 684 (9th Cir. 1956).

As a first cause of action, plaintiff here alleges generally a breach of contract arising from the relationship of plaintiff and defendant as customer-stockbroker and violation of Regulation T (12 CFR 220) dealing with margin requirements and withdrawal of funds from margin accounts.  He alleges that defendant accepted plaintiff's stock account on September 16 and 17, 1971, on a margin account basis;  that defendant made margin maintenance calls on the account;  and that defendant had agreed to manage plaintiff's account with the condition that plaintiff could withdraw his account in any amount exceeding a 30 percent equity maintenance. The breach of contract claim is grounded in the allegation that defendant refused to allow plaintiff to withdraw the amount of $33,000.00 from his account and there-

by damaged plaintiff in reputation and portfolio.

Plaintiff's second cause of action actually encompasses several separate claims. Plaintiff alleges generally that defendant violated federal rules and regulations governing credit in stockholder accounts; acted on a confidential credit report in violation of law pertaining to credit reports; employed fraudulent and manipulative methods and practices in notifying plaintiff as to liquidation due for maintenance; submitted or released deceptive account reports to another brokerage house that was willing to accept plaintiff's account; and, because of all these actions, hoped to generate additional income by forced liquidation, due to the poor investment grade securities contained in the account.

Jurisdiction is claimed under the Federal Securities and Exchange Act of 1934 (15 U.S.C. § 78a et seq.) and under diversity of citizenship.

Defendant in lieu of answer has moved to stay proceedings and has petitioned for an order to compel arbitration pursuant to Title 9 U.S.C. § 1 et seq. of the Federal Arbitration Act. The case is here on that motion.

Title 9 U.S.C. § 3 provides as follows:

"If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."

On September 17, 1971, plaintiff and defendant entered into a written contract entitled "Customer's Margin Agreement," paragraph 10 of which reads as follows:

"This agreement shall inure to the benefit of your successors and assigns, shall be binding on the undersigned, his heirs, executors, administrators, and assigns, and shall be governed by the laws of the State of New York. Any controversy arising out of or relating to my account, to transactions with you for me or to this agreement or the breach thereof shall be settled by arbitration in accordance with the rules, then in effect, of the American Arbitration Association or the Board of Governors of the New York Stock Exchange as I may elect. If I do not make such election by registered mail addressed to you at your main office within 5 days after demand by you that I make such election, then you may make such election. Judgment upon any award rendered by the arbitrator may be entered in any court having jurisdiction thereof."

Neither party has attacked the validity of the "Customer's Margin Agreement" or specifically paragraph 10, dealing with the arbitration of disputes. Therefore, the arbitration agreement is the only proper remedy between the parties as to disputes referable to arbitration in accordance with the Federal Arbitration Act, 9 U.S.C. § 3.

Plaintiff in response, however, has raised four grounds in opposition to defendant's motions. Plaintiff asserts that the motions should be denied because: (1) A letter of September 24, 1971, constitutes a superseding agreement between the parties which is not subject to the arbitration agreement of September 17, 1971; (2) Arbitration is waived by defendant's delay; (3) Arbitration in this case would be in restraint of trade; and (4) If jurisdiction is proper under the Securities and Exchange Act of 1934, then no effect can be given to the arbitration agreement. Each of these grounds will be hereafter examined.

**(1) DOES THE CONTRACT IN QUESTION REQUIRE ARBITRATION?**

Plaintiff contends that although the "Customer's Margin Agreement," which

included the arbitration clause, was signed by plaintiff and defendant on September 17, 1971, a subsequent letter of September 24, 1971, constitutes a new agreement between the parties and is not subject to the September 17 agreement or arbitration clause. The September 24, 1971, letter was sent by one Joaquin P. Horton [apparently a representative of defendant] to one James J. Macchiavelli [apparently a manager of some of plaintiff Armand Macchiavelli's accounts]. [See Addendum to this Opinion which sets out in their entirety the September 17, 1971, "Customer's Margin Agreement" and the September 24, 1971, letter.]

■ Even if it could be said that the September 24, 1971, letter from Horton to James Macchiavelli rises to the level of a binding contract between plaintiff and defendant, there is nothing in the letter which could be construed as creating a new or superseding agreement as to the September 17, 1971, margin agreement. At most, the September 24, 1971, letter clarifies terms and sets standards which the September 17, 1971, margin agreement gave defendant discretion to set. For example, paragraphs 5, 6 and 7 of the margin agreement give defendant broad discretion to set margin requirements, transfer among accounts, and set rates of interest and service charges. The provisions of the September 24, 1971, letter serve only to implement the discretion and management authority conferred by plaintiff to defendant in the margin agreement.

Furthermore, as noted previously, paragraph 10 of the margin agreement of September 17, 1971, contains the following language:

". . . Any controversy arising out of or relating to my account, to transactions with you for me or to this agreement or the breach thereof shall be settled by arbitration."

This language makes clear that the arbitration clause was intended to apply not only to claimed breaches of the margin agreement, but to all transactions or controversies arising out of the customer-broker relationship.

Two cases, both from the District Court for the Southern District of New York, are applicable and we accept their reasoning here. In Tepper Realty Co. v. Mosaic Tile Co., 259 F.Supp. 688, 691 (S.D.N.Y.1966), an arbitration clause was included in agreement A between the parties, but not specifically included in agreements B and C between the parties. Suit was brought on agreements B and C and plaintiff's contention that the arbitration clause of agreement A was inapplicable was rejected:

"In the face of the complaint and the express provisions of the written contracts, plaintiff's contention that there is no arbitration agreement simply because the parties to the agreements did not choose to express an arbitration clause in the body of their contracts or resort to the rubric of incorporating the specifications by express reference is untenable. The question is not whether the parties, like the scrivener of old, followed some talismanic formula, but whether they manifested a mutual intent to arbitrate disputes arising out of the contracts, and it is plain on the immutable facts that they did." 259 F.Supp. at 691.

In Robinson v. Bache & Co., 227 F.Supp. 456 (S.D.N.Y.1964), an arbitration clause virtually identical to the one in the instant case was in question. Plaintiff alleged that the arbitration clause which was contained in a margin and lending agreement between plaintiff and defendant was inapplicable since (1) the cause of action arose outside the margin and lending agreement and related to alleged bad advice by defendant, and (2) the cause of action sounded in tort. The court rejected these contentions and applied the arbitration clause:

"The controversy between plaintiff and defendant as framed by the complaint and the papers on this motion is arbitrable under the terms of their agreement as being 'out of or relating to [plaintiff's] account, to transac-

tions with or for [plaintiff] or to this agreement or the breach thereof'. It is immaterial that the complaint 'sounds in tort', [citations omitted] or that plaintiff believes that the arbitration clause is limited to his margin and lending relationship with defendant since the clause cannot be so construed." 227 F.Supp. at 458.

Applied to this case, the "Customer's Margin Agreement" of September 17, 1971, and the arbitration clause therein, when read as a whole, is a document intended to govern the entire relationship between the parties as customer-broker. There is no intimation that the letter of September 24, 1971, was intended to supersede the "Customer's Margin Agreement" or specifically, the arbitration clause.

## (2) DID DEFENDANT WAIVE ARBITRATION BY DELAY?

■ Plaintiff asserts that defendant's purported delay in requesting arbitration of their dispute waives any right defendant may have had to arbitrate. Although not cited, plaintiff apparently relies upon the proviso in 9 U.S.C. § 3 that a stay of court proceedings is permissible to allow arbitration, "providing the applicant for the stay is not in default in proceeding with such arbitration."

In the present case, the complaint was filed on October 13, 1972, and served on defendant October 20, 1972. Two stipulations extending time for answer or other response were filed and on December 7, 1972, in lieu of answer and prior to any discovery, defendant made demand for arbitration.

The only cases cited by plaintiff in support of his contention are inapposite here. In Cargo Carriers Inc. v. Erie & St. Lawrence Corp., 105 F.Supp. 638 (W.D.N.Y.1952), defendant's motion for arbitration was made one year after the complaint had been filed and following extensive discovery. In Barber & Ross Co. v. Cornell & Co., 242 F.Supp. 825 (D.C.D.C.1965), defendant's demand for arbitration came after filing of the answer and four months after filing of the complaint.

Upon a careful review of the cases dealing with a party in default under 9 U.S.C. § 3, this Court concludes that the "delay" in this case of less than 60 days upon stipulation of the parties does not rise to the level of "default" contemplated by 9 U.S.C. § 3.

## (3) IS ARBITRATION IN THIS CASE IN RESTRAINT OF TRADE?

■ Plaintiff urges that arbitration should be denied since to require an investor to submit to arbitration in order to do business with a brokerage house would be in restraint of trade.

Such attacks are not encouraged in the federal courts: "As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court." Kelly v. Kosuga, 358 U.S. 516, 518, 79 S.Ct. 429, 431, 3 L.Ed. 2d 475 (1959).

In Dickstein v. duPont, 443 F.2d 783, 786 (1st Cir. 1971), the court enumerated the reasons behind the Supreme Court's disfavor with anti-trust defenses to contract actions:

"First, the availability of such a contract defense may be utilized by contracting parties to obtain the benefits of a contract without consideration. . . . As a second reason for the *Kelly* policy, the Court has noted that an anti-trust defense to contract actions is generally unnecessary to achieve compliance with the anti-trust law. . . . Finally, the ready availability of such defenses would tend to prolong and complicate contract disputes." 443 F.2d at 786.

While the first reason is inapplicable in the instant case, the second and third reasons are appropriate. The express remedies of the anti-trust laws do not require supplementation by a defense in a contract action. Kelly v. Kosuga, 350 U.S. 516, 519, 79 S.Ct. 429, 3 L.Ed. 2d 475 (1959). Further, to convert a

fairly simple dispute on the arbitration agreement such as the present case into a lengthy and complex trial on restraint of trade seems wasteful and unnecessary. Dickstein v. duPont, 443 F.2d 783, 786 (1st Cir. 1971).

However, despite these policy reasons against litigating anti-trust defenses in contract disputes, *Kelly* does not hold that no such defense can be raised. Kelly v. Kosuga, 350 U.S. 516, 520, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959). As noted in Dickstein v. duPont, 443 F.2d 783, 786 (1st Cir. 1971):

"But antitrust defenses are allowed only in cases where the intrinsic illegality of the contract is so clear that enforcement would make a court party to the precise conduct forbidden by the law. [citation omitted] In the instant case, the alleged antitrust violation does not even seem to be clear to appellant, much less to the court." 443 F.2d at 786.

■■ Similarly, in the present case, plaintiff has cited no specific violation of anti-trust laws and has only generally alleged that arbitration agreements between brokers and customers are in restraint of trade. Such a general allegation is clearly not sufficient to overcome the reasoning of Kelly v. Kosuga, 350 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959). Indeed, it appears that arbitration of investor-broker disputes would, if anything, be in aid of trade by providing an efficient, inexpensive and adequate resolution to conflicts. Plaintiffs third contention is thus without merit to defeat the arbitration agreement.

### (4) DOES THE SECURITIES AND EXCHANGE ACT OF 1934 BAR ARBITRATION?

Plaintiff finally contends that no effect can be given the arbitration clause since jurisdiction is sought under the Securities and Exchange Act of 1934 15 U.S.C. § 78a et seq.). Although the complaint lacks a certain amount of specificity on this point, the section apparently relied upon is Section 10(b) (15 U.S.C. § 78j(b)) which makes it a violation of the Act:

"To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5 (17 CFR § 240.10b5) promulgated by the Securities and Exchange Commission, is also relied upon in the complaint:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or,

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

■■ Plaintiff's contention that the 1934 Act bars arbitration proceedings is based on the reasoning that an express contractual remedy such as arbitration may not waive a federal cause of action under the 1934 Act. This very issue was clearly decided by the Supreme Court in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), where the validity of an arbitration agreement was tested against the federal remedy under the 1934 Act. In *Wilko* the Supreme Court said: "Two policies, not easily reconcilable, are involved in this case. Congress has afforded participants in transactions subject to its legislative power

an opportunity generally to secure prompt, economical and adequate solution of controversies through arbitration if the parties are willing to accept less certainty of legally correct adjustment. On the other hand, it has enacted the Securities Act to protect the rights of investors and has forbidden a waiver of those rights. Recognizing the advantages that prior agreements for arbitration may provide for the solution of commercial controversies, we decide that the intention of Congress concerning the sale of securities is better carried out by holding invalid such an agreement for arbitration of issues arising under the Act." 346 U.S. at 438, 74 S.Ct. at 188.

Thus, the arbitration agreement may not bar a federal cause of action under the 1934 Act and the primal issue becomes whether the 1934 Act and specifically Section 10b and Rule 10b–5 have been sufficiently raised by plaintiff as a jurisdictional basis for suit. This is in accord with FRCP 12(b)(1) which authorizes a defendant to make application for a stay pending arbitration, if as a matter of law the issues presented by the suit are referable to arbitration. The essence of the motion for a stay pending arbitration is a question of the court's subject matter jurisdiction. Evans v. Hudson Coal Co., 165 F.2d 970 (3d Cir. 1948).

This Court must, therefore, test the sufficiency of the complaint to raise jurisdiction under the 1934 Act. Plaintiff has generally alleged jurisdiction under the 1934 Act as follows:

In paragraph I of his First Cause of Action plaintiff asserts: "This complaint is filed and the jurisdiction of this Court is invoked under Federal Securities Act of 1934 and diversity of citizenship."

In paragraph V of his First Cause of Action plaintiff asserts: "That defendant Shearson, Hammill & Co., incorporated, hereinafter designated as stockbroker, violated Rule 10b–5 of the Federal Securities Act of 1934 and Regulation T (12 CFR 220) and

carried out such acts in violation thereof by the use of an instrumentality of interstate commerce, namely, interstate communication setups." In paragraph VII of his Second Cause of Action plaintiff asserts: "Shearson Hammill employed fraudulent and manipulative methods and practices in notifying Mr. Armand Macchiavelli as to liquidation due for maintenance purposes and in submitting or releasing deceptive or false account status reports to another brokerage firm that was willing to accept the account. Shearson Hammill's actions were to prevent transfer of Mr. Armand Macchiavelli's margin accounts to another brokerage firm, and to generate additional income and revenue by forced liquidation due to the poor investment grade securities contained in the accounts."

The Federal Rules of Civil Procedure generally do not require a claimant to set out in detail facts upon which he bases his claim. The rules only require "a short and plain statement of the claim" that will give defendant fair notice of the claim and the grounds upon which it rests. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

FRCP 9(b), on the other hand, provides that: "In all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." This rule attempts to protect defendants from the harm that may come to their reputations or to their goodwill when they are charged with wrongdoing:

"It has been said that the requirement [of particularity] is necessary to safeguard potential defendants from lightly made claims charging commission of acts that involve some degree of moral turpitude." 7 Wright & Miller, Federal Practice and Procedure § 1296 p. 399 (West 1969).

However, the Ninth Circuit Court of Appeals has consistently held that a showing of common law fraud under FRCP 9(b) is not essential to establish a claim based upon Section 10(b) and

Rule 10b–5. Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961). In Royal Air Properties Inc. v. Smith, 312 F.2d 210, 212 (9th Cir. 1962) the court said:

"In an action brought under section 10b, common law fraud need not be alleged or ultimately proved. After establishing the use of some means of interstate commerce, the mails, or any national stock exchange facility, Rule 10b–5(b), a proper implementation of section 10(b), only requires proof of a material misstatement or an omission of a material fact in connection with the purchase or sale of any security to make out a prima facie case [citation omitted]." 312 F.2d at 212.

Ever since the Second Circuit's decision in Securities and Exchange Commission v. Texas Gulf Sulphur, 401 F.2d 833 (2d Cir. 1968), much discussion has occurred within the federal system attempting to define the scope of liability in private actions brought under Section 10(b) and Rule 10b–5. The Second Circuit today holds that Section 10(b) and Rule 10b–5 violations require allegations of material misstatements or omissions made with scienter: knowledge of falsity or a reckless disregard for the truth. Leasco Corp. v. Taussig, 473 F.2d 777 (2d Cir. 1972); Independent Investor Protective League v. New York Stock Exchange, 367 F.Supp. 1376 (S.D.N.Y.1973).

Other circuits have ruled that scienter is not a necessary element of a Section 10(b) or Rule 10b–5 claim for relief. Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965); Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967); Securities and Exchange Commission v. Van Horn, 371 F.2d 181 (7th Cir. 1966). See also Bucklo, Scienter and Rule 10b–5, 67 Nw. U.L.Rev. 562 (1972).

The Ninth Circuit has adopted a broader standard than the Second Cir-cuit. In the Ninth Circuit, private actions under Section 10(b) or Rule 10b–5 may be based on scienter or negligence. Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961); Smith v. Guaranty Service Corp., 51 F.R.D. 289, 294 (N.D.Cal. 1970); Orn v. Eastman Dillon, 364 F. Supp. 352 (C.D.Cal.1973).

While the scope of liability in private Section 10(b) and Rule 10b–5 actions is thus a question of some disagreement among the circuits, the issue here is whether the plaintiff in his complaint has made a sufficient allegation to raise jurisdiction under Section 10(b) and Rule 10b–5.

■ The complaint here does not allege negligence, but it does allege fraud. As stated previously, the Ninth Circuit requires only the allegation of the use of some means of interstate commerce, the mails or a national exchange, and an allegation of a material misstatement or omission of a material fact in connection with the purchase or sale of any security. Royal Air Properties Inc. v. Smith, 312 F.2d 210 (9th Cir. 1962).

As noted above, in his Second Cause of Action paragraph VII, plaintiff alleges two specific instances of fraud: (1) that defendant employed fraudulent and manipulative devices in notifying plaintiff as to liquidation due for maintenance purposes;[1] and (2) that defendant submitted or released false and deceptive account status reports to another brokerage firm to prevent transfer of plaintiff's account. The clear intendment of these allegations is that defendant took these actions to force liquidation and thus gain additional brokerage fees.

■ These allegations of fraud in connection with the purchase and sale of securities, when liberally construed, are sufficient to raise a federal cause of action and to invoke federal juris-

1. It is the practice of stockholders generally to allow customers to purchase stock while maintaining the cash or marketable securities in the customer's account at a percentage level of the market value of stocks in that account. This percentage level is denominated the main-tenance level and the broker will from time to time notify the customer as to whether the amount of cash or marketable securities in the account is below or above maintenance level. If the cash or securities is below main-tenance level, then after notification to the

diction under Section 10(b) and Rule 10b–5. This is not a case where a dissatisfied investor sues his stockbroker and attempts to defeat a valid arbitration agreement by the bare allegation of Securities Act violations. Here plaintiff has made out a sufficient allegation of Securities Act violations by specific and factual contentions and is entitled to proceed in federal court notwithstanding the arbitration agreement. The allegations are not merely conclusory but have a factual base and sufficiently serve the notice requirements of the Federal Rules of Civil Procedure.

This Court at this juncture is faced with one cause of action grounded in violations of Section 10(b) and Rule 10b–5, and other allegations of breach of contract and violations of various federal exchange and credit rules. As previously discussed, the alleged violations of Section 10(b) and Rule 10b–5 are clearly cognizable as a federal cause of action and may not be submitted to arbitration. Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953).

■■■■ Plaintiff's other allegations, however, are of the kind which must be referable to arbitration in accordance with the strong federal policy favoring liberal enforcement of arbitration agreements. Lundgren v. Freeman, 307 F.2d 104, 110 (9th Cir. 1962). As noted above, these other allegations include breach of contract, violations of Regulation T (12 CFR 220), and violations of unspecified federal rules dealing with credit transactions.

■■■■ As a preliminary matter, it must be noted that Title 9 U.S.C. § 2 mandates that:

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle [controversies] by arbitration . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

The parties here have not disputed that the "Customer's Margin Agreement" between them was such a "transaction involving commerce", and it is accepted law that transactions involving purchase and sale of securities on national exchanges involve commerce. Robinson v. Bache, 227 F.Supp. 456 (N.Y.1964).

■■■■ Courts have taken a liberal attitude as to the subjects cognizable in arbitration. Michael v. SS Thanasis, 311 F.Supp. 170 (N.D.Cal.1970). Breaches of contract are the archetypal kinds of disputes referable to arbitration. Aerojet-General Corporation v. American Arbitration Association, 478 F.2d 248 (9th Cir. 1973); Ross v. Twentieth Century Fox, 236 F.2d 632 (9th Cir. 1956). So strong, in fact, is the policy of enforcement of arbitration agreements to decide disputes based upon the contract that: "It has been held that a complaint sounding in tort will not in itself prevent arbitration if the underlying contract embraces the disputed matter." Legg, Mason & Co., Inc. v. Mackall & Coe, Inc., 351 F.Supp. 1367 (D.C.D.C.1972). The allegation of Regulation T violations is a subject referable to arbitration. Robinson v. Bache & Co., 227 F.Supp. 456 (S.D.N.Y.1964). Finally, although plaintiffs fails to specify the federal rules dealing with credit transactions which defendant is alleged to have violated, it is clear that the Federal Arbitration Act is as applicable to controversies based upon statutes as to controversies based on the contract. Wilko v. Swan, 346 U.S. 427, 432, 74 S.Ct. 182, 98 L.Ed. 168 (1953). In line with the liberal policy favoring arbi-

customer and subsequent inability of the customer to funnel into the account additional cash or securities, the broker may liquidate a portion or all of the account so as to achieve the maintenance level. If on the other hand the cash or marketable securities in the account exceeds the maintenance level then the customer, again after notification, would normally purchase new stock with the cash and

marketable securities exceeding maintenance level.

The allegation here is that defendant employed fraudulent and manipulative methods and practices in its notifications to plaintiff as to the maintenance level of plaintiff's account, thus forcing allegedly unnecessary liquidations and upsetting the character of plaintiff's account.

tration, it must be concluded that plaintiff's unspecified and general allegations of credit violations are appropriately referable to arbitration. Lundgren v. Freeman, 307 F.2d 104 (9th Cir. 1962); Metro Industries v. Terminal Construction Co., 287 F.2d 382 (2d Cir. 1961), cert den. 368 U.S. 817, 82 S.Ct. 31, 7 L.Ed.2d 24.

The cases dealing with the power of the district court to split the causes of action between the federal court and arbitration have recognized the district court's broad discretion. Collins Radio Co. v. Ex-Cell-O Corp., 467 F.2d 995 (8th Cir. 1972); Leesona Corp. v. Cotwool Mfg. Corp., 204 F.Supp. 141 (W.D.S.C.1962). Where both federally cognizable issues and arbitrable issues existed in a single case, the courts have not hesitated to split the issues accordingly. Younker Bros. Inc. v. Standard Construction Co., 241 F.Supp. 17 (S.D.Iowa 1965); Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1965). In Shapiro v. Jaslow, 320 F.Supp. 598 (S.D.N.Y.1970), the court recognized its power to stay arbitration with respect to claims under the Securities Acts and to leave other claims to the arbitration process, but held that such a split was not possible under the circumstances of the case, since the federal law issues were inseparable from the other issues.

Although related, the claims of Securities Act violations in this case are clearly severable from the other claims, both factually and legally. Such a severance in the present case would serve well the purposes of both the Securities and Exchange Act of 1934 (by retaining jurisdiction in this Court over the cause of action grounded upon violations of Section 10(b) and Rule 10b–5). Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), and the Federal Arbitration Act (by referring to arbitration those questions of breach of contract and alleged violations of federal exchange and credit rules which are matters "referable to arbitration"), Title 9 U.S.C. § 3.

In accordance with the foregoing discussion,

It is therefore ordered

(1) That as to any and all claims based upon alleged violations of Section 10(b) and Rule 10b–5, the motion to compel arbitration and to stay proceedings pending arbitration is hereby denied. Plaintiff is ordered to submit an amended complaint to this Court delineating the allegations of violations of Section 10(b) and Rule 10b–5.

(2) That as to any and all claims between plaintiff and defendant in this case, except alleged violations of Section 10(b) and Rule 10b–5, the proper remedy is arbitration as enunciated in the "Customer's Margin Agreement" between the parties dated September 17, 1971, and the motion to compel arbitration and to stay proceedings on these claims is hereby granted.

Addendum

## CUSTOMER'S MARGIN AGREEMENT

### SHEARSON, HAMMILL & CO.

INCORPORATED

14 WALL STREET

NEW YORK, NEW YORK 10005

Gentlemen:

I agree as follows with respect to my accounts which I have opened with you for the purchase and sale of securities and commodities.

1. I hereby represent that I am over 21 years of age; that I am not an employee, member or partner of any security or commodity

exchange or member firm thereof, or of any corporation a majority of the stock of which is owned by any exchange; that I am not an employee of any bank, banker, trust company, insurance company or of any brokerage firm or corporation, association, firm or individual engaged in the business of dealing in securities or commodities, bills of exchange, acceptances or other forms of commercial paper.

2. The word "property" is used herein to mean securities of all kinds, commodities, and contracts for the future delivery of, or otherwise relating to, commodities or securities and all property usually and customarily dealt in by brokerage firms.

3. All transactions for my accounts shall be subject to the constitutions, rules, regulations, customs and usages (as the same may be constituted from time to time) of the exchange, market or place (and is clearing house, if any) where executed. Actual deliveries are intended on all transactions.

4. Any and all property belonging to me or in which I may have an interest held by you or carried in any of my accounts (either individually or jointly with others) shall be subject to a general lien for the discharge of my obligations to you, wherever arising and without regard to whether or not you have made advances with respect to such property, and without notice to me may be carried in your general loans and may be pledged, re-pledged, hypothecated, or re-hypothecated, separately or in common with other property, for the sum due to you thereon or for a greater sum and without retaining in your possession and control for delivery a like amount of similar property.

5. I will maintain such margins as you may in your discretion require from time to time and will pay on demand any debit balance owing with respect to any of my accounts. You may, in the event of my death or whenever in your discretion you consider it necessary for your protection, sell any or all property held in any of my accounts, cancel any open orders for the purchase or sale of any property with or without notice to me, and you may borrow or buy in any property required to make delivery against any sale effected for me. Such sale or purchase may be public or private and may be made without advertising or notice to me and in such manner as you may in your discretion determine, and no demands, calls, tenders or notices which you may make or give in any one or more instances shall invalidate the aforesaid waiver on my part. At any such sale you may purchase the property free of any right of redemption and I shall be liable for any deficiency in my margined accounts.

6. All transactions in any of my accounts are to be paid for or required margin deposited not later than 2 p.m. on the settlement date. I agree that any debit occurring in any of my accounts may be transferred by you at your option to my margin account. At any time and from time to time, you may, in your discretion, without notice to me, apply and/or transfer any property or equity therein, interchangeably between any of my accounts, whether individual or joint or from any of my accounts to any account guaranteed by me. You are specifically authorized to transfer to my cash account on the settlement date following any purchase made in that account, excess funds available in

any of my other accounts to said cash account sufficient to make full payment of this cash purchase.

7. I agree to pay interest and service charges upon my accounts monthly at the prevailing rate, as determined by you.

8. I agree that, in giving orders to sell, all "short" sale orders will be designated as "short" and all "long" sale orders will be designated as "long" and that the designation on a sale order as "long" is a representation on my part that I own the security, and if the security is not in your possession, that it is then impracticable to deliver the security to you forthwith and that I will deliver it as soon as possible.

9. This agreement and all the terms thereof shall be binding upon my heirs, executors, administrators, personal representatives and assigns. In the event of my death, incompetency or disability, whether or not executors, administrators, committee or conservators of my estate and property shall have qualified or been appointed, you may place orders for the sale of property which you may be carrying for me or buy any property of which my accounts may be short, or any part thereof, under the same terms and conditions as hereinabove stated, as though I were alive and competent, without prior notice to my heirs, executors, administrators, personal representatives, assigns, committee or conservators, and without prior demand or call of any kind upon them or any of them.

10. This agreement shall inure to the benefit of your successors and assigns, shall be binding on the undersigned, his heirs, executors, administrators and assigns, and shall be governed by the laws of the State of New York. Any controversy arising out of or relating to my account, to transactions with you for me or to this agreement or the breach thereof, shall be settled by arbitration in accordance with the rules, then in effect, of the American Arbitration Association or the Board of Governors of the New York Stock Exchange as I may elect. If I do not make such election by registered mail addressed to you at your main office within 5 days after demand by you that I make such election, then you may make such election. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

11. Your failure to insist at any time upon strict compliance with this agreement or with any of its terms or any continued course of such conduct on your part shall in no event constitute or be considered a waiver by you of any of your rights or privileges. Notice or other communications mailed to me at the address given on the reverse side shall, until you have received notice in writing of a different address, be deemed to have been personally delivered to me.

(s) X  Armand Macchiavelli

Date:  9–17–71     Customer's Signature: (s) X _____

LENDING AGREEMENT      I hereby represent that I am over 21 years of age

You are hereby specifically authorized to lend, either separately or with other securities, to either yourselves as brokers or to others, any securities held by you on margin for my/our account(s) or as collateral therefor.

This agreement shall also inure to the benefit of your successors, by merger, consolidation or otherwise, and assigns, and you may transfer my account to any such successors or assigns.

This agreement shall continue until signed notice of revocation is received by or from me, and in case of such revocation it shall continue effective as to transactions entered into prior thereto.

(s) **X** <u>Armand Macchiavelli</u>

Customer's

Date: <u>9–17–71</u>   Signature: (s) **X** _____

### SHEARSON, HAMMILL & CO.

*Incorporated/Founded 1902*

*Bank of America Center*
*Suite 3500*

*Members*
*New York Stock Exchange*
*and other Leading Security*
*& Commodity Exchanges*

*San Francisco, California   94104*
*(415) 362–7440*

September 24, 1971

*Main Office*
*14 Wall Street*
*New York*

Mr. James J. Macchiavelli
6050 South Land Park Drive
Sacramento, California   95822

Dear Jim,

Although we have accepted Armand Macchiavelli's accounts, you are no doubt well aware of our initial reluctance and continued concern. There were several reasons, some of which are: *

1) Armand's past relationships with other brokerage firms.

2) The current status of his accounts—broker loans exceed the equity.  The problem of liquidity in some of the positions.

3) The banks refusal to accept certain stocks for collateral, necessitating Shearson, Hammill to substitute other securities for loan value.

Jim, the most important consideration for our acceptance of the accounts is the fact that they are under your personal professional management.

In accordance with our many conversations, we are in agreement that certain actions are necessary.

1) Immediate restructure of the accounts to prevent:
   a. Maintenance calls.
   b. Solve the problems pertaining to stocks with no loan value, liquidity and potential delisting.
   c. Development of an investment program consistent with Armand's objectives and current financial needs.

2) To eliminate any potential misunderstanding in the accounts, it is requested that you personally handle all matters.

3) Only as long as the above conditions are fulfilled are we willing to grant the following:
   a. In computing market value, fractions will be considered for all security positions.

* See attached schedule

b.   The account(s) will be maintained not less than (30%) thirty percent equity through December 31, 1971.

c.   The account(s) will be subject to Shearson, Hammill's regular house maintenance requirements as of January 1, 1972.

d.   Shearson, Hammill will consider the combined values of all Armand Macchiavelli's accounts in calculating equity and maintenance requirements. This condition may be modified at any time by written instructions from the undersigned.

e.   On a weekly basis, Shearson, Hammill will forward a complete summary of the account(s) including all stock positions, complete market values, current debit balances, equity positions, maintenace requirements and current SMA figures.

f.   Shearson, Hammill will furnish the undersigned with duplicate copies of all stock transactions, monthly statements, and any federal or house calls.

g.   Any stock dividends not exceeding ten percent (10%) will be transferred to the cash account.

h.   All cash dividends payable in the margin account will be credited to the SMA account, and made available for withdrawal provided minimum maintenance or equity requirements are met.

i.   Transactions can be made in the account(s) while the account(s) are being transferred from another brokerage firm(s).

j.   Cash deposits required to meet house requirements will be credited to the SMA account. However, the funds will not be usable until such time as the equity position in the account exceeds the minimum requirements.

k.   If securities are liquidated in an account to meet house requirements, thirty percent (30%) of such proceeds will be credited to the SMA account. If the securities liquidated are held in the cash account, one hundred percent (100%) of the proceeds will be credited to the SMA upon transfer of said funds into the margin account.

l.   Securities deposited in the cash account will be considered in calculating market value for equity requirements. However, there will be no house maintenance requirements imposed on said securities in the cash account.

Jim, if for any reason, your management contract is terminated, written notification of the termination must be sent to Shearson, Hammill. It must be clearly understood that termination of your contract would immediately revoke the consideration stated above. The accounts would then be subject to Shearson, Hammill's regular house requirements.

I have the utmost confidence in your ability to handle the account. I do not foresee any problem that can nct be resolved.

Sincerely,

/s/ Joaquin P. Horton

Joaquin P. Horton

JPH/dr
cc   Archie Hefner
     Armand Macchiavelli