**CARIB AVIATION AND MARINE CONSULTANTS, LTD., Plaintiff,**

v.

**MITSUBISHI AIRCRAFT INTERNATIONAL, INC.,**
**Defendant/Counterclaimant,**

v.

**CARIB AVIATION AND MARINE CONSULTANTS, LTD., Paul Pyles, and Robert Mathews, Counter-Defendants.**

**No. 80–964–CIV.**

United States District Court,
S.D. Florida,
Miami Division.

June 12, 1986.

---

Richard H. Critchlow, of Finley, Kumble, Wagner, Heine & Underberg, Miami, Fla., for plaintiff.

Richard L. Williams, of Blackwell, Walker, Gray, Powers, Flick & Hoehl, Miami, Fla., William R. Pakalka and Layne E. Kruse, of Fulbright & Jaworski, Houston, Tex., for defendant/counterclaimant.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT AND SUBMITTING CASE TO ARBITRATION

EDWARD B. DAVIS, District Judge.

THIS MATTER came on for consideration on Defendant's Motion for Partial Summary Judgment on Plaintiff's claims. Plaintiff has conceded that the evidence concerning Defendant's monopoly power in the relevant market is insufficient to establish a violation of Section 2 of the Sherman Act. Consequently, Plaintiff has dismissed Counts I, II, IV, and VIII from its Complaint. This Order will therefore address only the remaining four counts.

### I. Background

Defendant Mitsubishi Aircraft International ("MAI") is a Texas Corporation with its headquarters in Dallas. MAI's principal business was assembling and selling a line of twin-engine turboprop aircraft known as the MU-2. MAI sold these aircraft throughout most of the world.

MAI used a few marketing techniques in selling the MU-2. In the United States, MAI sold the aircraft directly to customers through employees paid a base salary plus commissions. Outside the United States, MAI sold mostly through either distributors, who purchased and then resold the aircraft, or through sales representatives, who solicited purchase orders and received commissions on sales. Occasionally, MAI would sell directly when employees received purchase orders.

On March 31, 1978, MAI appointed Plaintiff Caribe Aviation and Marine Consultants, Ltd. ("CAMC") an international distributor of the MU-2. The Distributorship Agreement provided, *inter alia*, that MAI could terminate the distributorship without cause upon thirty days notice, and with cause upon no advance notice whatsoever.

As a distributor, CAMC's primary area of responsibility was the Caribbean Islands and El Salvador. While under the distributorship agreement MAI allowed CAMC to sell aircraft outside its territory, it judged CAMC's performance solely upon sales within its designated area.

The relationship between MAI and CAMC slowly deteriorated. CAMC never sold an MU-2 within its territory; it fell behind in payments to MAI; and MAI began hearing rumors that CAMC was engaged in selling aircraft to the Nicaraguan government for conversion into warplanes. On July 13, 1979 MAI terminated CAMC as a distributor, effective ninety days later. That termination spawned the instant action.

### II. Discussion

#### A. Refusal to Deal

Count III of the Complaint alleges that the Defendant violated Section 1 of the Sherman Antitrust Act by refusing to deal with CAMC.[1] Specifically, the Plaintiff alleges that MAI:

—refused to fill CAMC orders, even though CAMC had fully complied with conditions precedent to the fulfillment of such orders;

---

1. Although Plaintiff alleges in its Memorandum that Defendant engaged in price-fixing, it nowhere mentions price-fixing in the remaining antitrust counts. Plaintiff alleged price-fixing in Count I, which it has subsequently withdrawn. Plaintiff's arguments concerning price-fixing and the cases cited therein are therefore relevant only as evidence that Defendant's refusal to deal carried an unlawful intent.

—intentionally and arbitrarily delayed the acceptance of purchase orders on other aircraft, causing prospective customers of CAMC to cancel their contracts;

—refused to provide CAMC with necessary documentation or information regarding the availability of aircraft;

—refused to supply CAMC with documents necessary to consummate sales with prospective customers; and

—refused to provide CAMC with any information that was required pursuant to the distributor's agreement.

Most, if not all, of these actions occurred during the period after MAI terminated CAMC, but before the effective date of the termination. Plaintiff also claims that MAI wrongfully terminated the distributorship agreement, in furtherance of its intentional refusal to deal.

■■ A violation of Section 1 of the Sherman Act requires proof of a "contract, combination ... or conspiracy, in restraint of trade...." 15 U.S.C. Section 1. To create a triable issue under Section 1, the Plaintiff must show concerted anticompetitive conduct by a plurality of actors. *Aquachem Company v. Olin Corporation*, 699 F.2d 516 (11th Cir.1983). Regardless of purpose or effect, Section 1 "does not prohibit independent business actions and decisions" by a single entity. *Spectrofuge v. Beckman Instruments, Inc.*, 575 F.2d 256, 275 (5th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).[2] A manufacturer generally has a right to deal, or refuse to deal, with whomever it chooses, so long as its decision is made independently. *National Independent Theatre Exhibitors v. Charter Financial Group*, 747 F.2d 1396, 1402 (11th Cir.1984); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 760, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984).

■ Plaintiff has not proved that *any* person or entity besides the Defendant, including Plaintiff itself, was involved in Defendant's refusal to deal. It has failed to prove that any contract or conspiracy existed, and even admits in its brief that Defendant's action was unilateral.

Plaintiff argues, however, that it was an unwilling co-conspirator, citing *Home Placement Service v. Providence Journal Co.*, 682 F.2d 274 (1st Cir.1982). The Court in that case explained, however, that to be a co-conspirator a Plaintiff must have "agreed to comply with Defendant's restriction." *Id.*, at 279. Certainly the Plaintiff could not have refused to deal with itself. Moreover, it never "agreed" to fix prices or sell strictly within a designated territory. The international distributorship agreement merely names the Caribbean and El Salvador as CAMC's "primary area of responsibility." CAMC sold aircraft outside the area and attempted to sell at prices lower than MAI quoted. Therefore, it did not agree in any sense to fix prices. Even if, as Plaintiff claims, Defendant refused to deal with Plaintiff because Plaintiff did not agree to fix prices, then Plaintiff could not have been a co-conspirator, because there was no agreement.[3]

Moreover, *Home Placement* was simply not a case concerning a refusal to deal. In *Home Placement*, the Defendant had refused to sell advertising to the Plaintiff. The Plaintiff then promised to succumb to the Defendant's demands, and on that basis the Defendant agreed to advertise. Thus, the Defendant ultimately did deal with the Plaintiff. That is not the case here. CAMC never agreed to fix its prices after MAI allegedly refused to honor purchase orders. CAMC never succumbed to any demands, because MAI did not have any. It simply refused to continue doing busi-

---

**2.** Decisions of the Fifth Circuit Court of Appeals issued on or before September 30, 1981 are binding on the courts of the Eleventh Circuit. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**3.** In fact, this Court doubts whether an unwilling co-conspirator can ever exist in a refusal to deal case. While a distributor may sometimes be placed in the awkward position of agreeing to fix prices in order to obtain a manufacturer's business, it is extremely difficult, if not totally impossible, to acquire business by agreeing not to deal with oneself.

ness with CAMC. As a matter of law, Plaintiff's claim must fail.

Plaintiff also relies on *United States v. Parke-Davis*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). In that case, also, the Defendant eventually obtained the cooperation of the distributors in fixing prices. In *Parke-Davis* the Court stated that a refusal to deal only becomes illegal "[w]hen the manufacturer's actions ... go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices." *Id.*, at 44, 80 S.Ct. at 511. Here, MAI did not employ any other means to effect adherence; it did not desire adherence. MAI wanted only to end its relations with CAMC. The distributorship in fact ended shortly thereafter. Whether MAI's conduct during this period constituted a breach of contract or other civil injury is another issue. It was not, however, a violation of the antitrust laws.

Even if a conspiracy existed here, CAMC has proffered no evidence, besides conclusory statements, that MAI's intention in refusing to deal with CAMC was to induce CAMC to fix prices. MAI had already cancelled the distributorship agreement, though the cancellation had not yet become effective. Far from wanting CAMC to capitulate, MAI had already expressed its intention to dissociate itself from CAMC altogether. There is no evidence that any other reason existed for refusing to deal with CAMC. Therefore, CAMC's claim under Count III must fail.

### B. Horizontal Market Allocation

In Count VII Plaintiff alleges that the Defendant, in concert with domestic distributors, attempted to geographically allocate its market for turboprop aircraft. Neither party disputes that, under MAI's market-

ing strategy, CAMC had a geographic area of primary responsibility. Although it was allowed to sell aircraft in other parts of the world, including the United States, it was encouraged to concentrate within its own territory. The question is whether such a strategy imposed by a manufacturer on its distributors violates Section 1 of the Sherman Act.

Courts use different standards in analyzing business conduct that threatens to restrain competition. Some conduct is a *per se* violation of the antitrust laws.[4] Other conduct, however, is scrutinized under the less stringent "rule of reason." Under that rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. *See, e.g., Continental T.V., Inc. v. GTE Sylvania Incorporated*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Plaintiff urges that the Court apply the *per se* rule in this case because, it claims, this is an agreement among competitors to allocate markets.

The law is clear that horizontal market restrictions among competitors are *per se* illegal. *United States v. Topco Associates*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). The law is just as clear, however, that vertical restrictions emanating from a manufacturer to its distributors are not *per se* violations, but are instead analyzed under the rule of reason. *Continental T.V., supra.*[5] In *Continental*, the Supreme Court discussed the complex market impact of vertical restrictions, noting their potential for simultaneously reducing *intra*band competition while stimulating *inter*brand competition.[6] The Court articulated several legitimate rea-

---

4. For example, an agreement among competitors to divide the market among themselves would be *per se* illegal. *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

5. *Continental*, decided in 1977, expressly overruled *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), which had held that vertical restrictions

imposed where title had passed to the distributor were *per se* violations of Section 1.

6. *Intrabrand* competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer; *interbrand* competition is competition among the manufacturers of the same generic product, and is the primary concern of antitrust law.

sons for vertical restrictions. Among other things, they allow the manufacturer to achieve certain efficiencies in the distribution of its products. Far from reducing competition in the marketplace, such restrictions provide manufacturers with several methods by which to *promote* competition.[7]

Plaintiff claims that MAI is, in this instance, acting as a competitor to CAMC because, besides selling aircraft to directly to CAMC, MAI also "sold aircraft to retail customers or end users, thus placing itself at the same level of the market structure as CAMC." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, at 33.[8] Therefore, Plaintiff claims, MAI's market restrictions were horizontal in nature and are *per se* illegal.

Conspiracies between a manufacturer and its distributors are only treated as horizontal when the source of the conspiracy is a combination of the distributors. *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 372–73, 87 S.Ct. 1856, 1862, 18 L.Ed.2d 1249 (1967). Here, it is undisputed that MAI imposed the restriction. Moreover, it is irrelevant under the law of this circuit that MAI also sold aircraft to end users.

> When a producer elects to market its good through distributors, the latter are not, in an economic sense, competitors of the producer even though the producer also markets some of its goods itself; rather, the distributors are "agents" of the producer, employed because the producer has determined that it can supply its goods to customers more efficiently by using distributors than it can by marketing them entirely by itself.

*Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1005 (5th Cir.

1981); *see also Abadir & Company v. First Mississippi Corporation,* 651 F.2d 422 (5th Cir.1981). Hence, the rule of reason applies in evaluating MAI's market allocation.

To prevail under the rule of reason, a Plaintiff must show that the Defendant's conduct has an adverse impact on competition. *Red Diamond Supply, supra* at 1005; *Daniels v. All Steel Equipment, Inc.,* 590 F.2d 111, 113 (5th Cir.1979); *H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239, 245 (5th Cir. 1978). CAMC, however, has not even *offered* evidence of adverse impact. MAI, on the other hand, claims—and CAMC apparently concedes—that its market share of domestic turboprop aircraft is only approximately 8%. The record reveals that there were at least five manufacturers of such aircraft during the relevant period. Furthermore, the undisputed evidence shows that the market is no less competitive now than it was at the time of the distributorship agreement. Thus, CAMC has not met its burden of proof under Count VII of the Complaint.

### C. Common Law Claims

The remaining two counts deal with breach of contract and intentional interference with contractual relationships. CAMC claims that MAI:

—contacted potential CAMC customers directly;

—delayed acceptance of CAMC purchase orders, causing CAMC to lose customers;

—told CAMC customers that CAMC would be unable to deliver aircraft contracted for;

—told CAMC customers that CAMC had misrepresented certain facts;

---

**7.** In fact, scholars in the field have argued that vertical restrictions should be *per se* legal. *See* Bork, "Vertical Restraints: *Schwinn* Overruled," 1977 Supreme Court Rev. 171, 181; Posner, "The Next Step in the Antitrust Treatment of Restricted Distribution: *Per Se* Legality," 48 U.Chi.L.Rev. 6, 16–17 (1981).

**8.** Plaintiff cites *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) in its brief in support of this proposition. That case concerned competing companies who created a cooperative buying association that allocated territories. *Topco* did not concern restrictions by manufacturers, and is therefore not relevant to this case.

—informed CAMC customers that if they bought the aircraft they would be unable to obtain service and parts;

—refused to provide CAMC with information on available aircraft;

—refused to supply CAMC with the documentation necessary to consummate sales;

—refused to permit CAMC to sell certain aircraft to customers; and

—wrongfully terminated the Distributorship Agreement.

Paragraph 33 of the International Distributorship Agreement provides that:

> *Any and all* disputes and differences *pertaining to or arising out of* this Agreement or the breach thereof shall be settled by arbitration in accordance with the rules of the American Arbitration Association ...

(emphasis added). This preference for arbitration is to be given presumptive effect even in doubtful cases. *See Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). This preference is even stronger in the international context. *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516–17, 94 S.Ct. 2449, 2455–2456, 41 L.Ed.2d 270 (1974).

 "Breaches of contract are the archetypal kinds of disputes referable to arbitration." *Macchiavelli v. Shearson, Hammill & Co.*, 384 F.Supp. 21 (E.D.Cal. 1974). Furthermore, an action sounding in tort may be arbitrated whenever, as here, the underlying contract embraces the disputed matter. *See Macchiavelli*, 384 F.Supp. at 30; *Legg Mason & Co. v. Mackall & Coe, Inc.*, 351 F.Supp. 1367, 1370–71 (D.D.C.1972). The Agreement between MAI and CAMC to sell and distribute certain aircraft manufactured by MAI embraces CAMC's sale of the aircraft to its customers. Defendant's counterclaims are also arbitrable, since they also arise under the contract. *See Macchiavelli, supra; Development Bank of the Phillipines v. Chemtex Fibers, Inc.*, 617 F.Supp. 55 (S.D. N.Y.1985) (claim under RICO statute is arbitrable); *See also Greenblatt v. Drexel*

*Burnham Lambert, Inc.*, 763 F.2d 1352 (11th Cir.1985).

Therefore, it is:

ORDERED AND ADJUDGED that Defendant's Motion for Partial Summary Judgment is hereby GRANTED IN PART and DENIED IN PART. Summary Judgment is GRANTED as to Counts III and VII. Summary Judgment is DENIED as to Counts V and VI; they are hereby submitted to arbitration. Counts I, II, IV, and VIII are hereby DISMISSED without prejudice.