HOME PLACEMENT SERVICE, INC. et al., Plaintiffs, Appellants,

v.

The PROVIDENCE JOURNAL COMPA-NY, Defendant, Appellee.

No. 81–1783.

United States Court of Appeals, First Circuit.

Argued March 4, 1982.

Decided June 18, 1982.

Ralph J. Gonnella, Providence, R. I., for plaintiffs, appellants.

Joseph V. Cavanagh, Jr., Providence, R. I., with whom Knight Edwards and Edwards & Angell, Providence, R. I., were on brief, for defendant, appellee.

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

ALDRICH, Senior Circuit Judge.

This action under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, is the second against defendant newspaper publisher, Providence Journal Company, for refusal to accept so-called rental information advertising in its classified columns. The first resulted in two decisions of this court, *Walker v. Providence Journal Co.*, 1 Cir., 1974, 493 F.2d 82, and *Homefinders of*

*America, Inc. v. Providence Journal Co.*, 1 Cir., 1980, 621 F.2d 441, ending favorably to the defendant. The present one is brought by a new, unconnected plaintiff, Home Placement Service, Inc.[1] In the first we held that even though defendant may have had a monopolistic position, it was justified in refusing the advertising because of its deceptive nature. Defendant contends that the present case is simply a replay. The district court agreed, and entered judgment for the defendant. Plaintiff appeals.

■ It is true that the record in the prior case was introduced herein for all purposes, and that the nature of plaintiff's business followed the same format as Homefinders, sometimes known, generally, as Rentex, but there was further evidence, which plaintiff asserted made a substantial difference. Unfortunately, so far as easy disposition of this appeal is concerned, we must label as clearly erroneous the court's finding that plaintiff's new evidence "is a distinction in search of a difference.... The respective schemes of Homefinders and Home Placement are, for purposes of this proceeding, indistinguishable." Rather, there were marked differences, requiring, as matter of law, a different result.

Homefinders' "scheme" was to advertise an individual rental with a brief and untraceable description, followed by a telephone number. The number was Homefinders'. The responder would be "told that the property advertised was no longer available, but if the prospective tenant would merely come to Homefinders' office and pay the fee of $20, other listings would be made available." *Homefinders of America, Inc. v. Providence Journal Co.*, D.R.I., 1979, 471 F.Supp. 416, 420. Homefinders' advertisement frequently was totally misleading—the property had never been available, indeed, often there never was such; the sole purpose of the ad was to sell the prospect a list of other properties. These further properties, even if available, and some were not, would not measure up to the attractive description in the fictitious ad-

vertisement, nor could the prospect discover this until he had made his payment. Disappointment, or worse, was a frequent consequence.

The present plaintiff, also, was endeavoring to sell a list of properties for which it required payment in advance, but there was no misrepresentation as to the availability of, or as to the description of, the particular item advertised. The statement in defendant's brief that the "ads were similar, if not identical in form, to the ads placed by Homefinders" is not true, either as to availability, or description. The district court had found that Homefinders' ads were "calculated to attract an unusual degree of attention.... For example, its advertisements stated that children and pets were welcome, utilities were paid and automobile parking was available." *Id.* This was readily accomplished because, as we said on appeal, the bait was artificial. 621 F.2d, ante, at 444. While plaintiff, also, had as its primary purpose the sale of lists, it did not use deceptive bait, and the court's finding that Home Placement's and Homefinders' schemes "both amounted to bait-and-switch artifices which employed misleading advertising" was an inaccurate equivalency.

As a result of Homefinders' advertisements, defendant received continuous complaints from its readers—defendant's brief described it as a "torrent." In addition to the unavailability of the property advertised, or, after payment, anything similar, readers, as well as the owners themselves, were sometimes put out by the fact that Homefinders listed properties without authority. The totality of complaints was, naturally, upsetting to defendant. It responded by adopting a policy, set forth daily in its classified section, of not knowingly accepting "advertising where a fee is required to obtain rental information," and, when the present plaintiff applied, adhered to it.

■ We had no difficulty in holding, quite apart from whether the other aspects

---

1. Joseph P. Muschiano, president of Home Placement, is also named as a plaintiff. For convenience, we will refer to Home Placement, singly, as plaintiff.

of the Sherman Act were satisfied—a question we did not reach—that defendant was not required to "immolate itself" by publishing Homefinders' misleading advertisements of which its readers justifiably complained. In the present case plaintiff's was a new business, and was cut off almost immediately. Rather than a "torrent" of complaints, there was not even a trickle.[2] Our first question, accordingly, must be whether plaintiff's "scheme" was still sufficiently objectionable to warrant the Homefinders treatment.

Defendant has a number of difficulties. Not only were there no actual complaints, but defendant failed to show any basis for any, either that the specific advertised property was false or exaggerated, or that plaintiff engaged in unauthorized listing. There was no evidence that it intended to do so. The substantive difference between plaintiff and Homefinders is analogous to the difference between a retailer who has, and advertises, a so-called lead, or loss-leader, to attract customers who will, hopefully, purchase other articles as well, and one who misrepresents a lead which, in fact, does not exist. The first practice is customary and ethical. The court's finding that "switching to a list of properties . . . using as bait an ad for a single [available] property" was deceptive bait-and-switch, would mean that every broker who advertised a single listing, and hoped that if a prospect found he

did not like that one he might sell him another, is a bait-and-switcher. This is inconceivable.[3]

It is true that there was evidence that a reader of classified real estate advertisements may expect that there will be no charge to him. The evidence was that in Rhode Island either the advertiser is the lessor himself, or, if a broker, he will be paid by the lessor. Whether, in order to avoid any possible misunderstanding, defendant could reasonably have required that the fee be disclosed in the advertisement was an alternative not proffered by defendant. Its announced policy made it clear that it would not publish plaintiff's ads even with such disclosure. For this it had no valid business reason. Were plaintiff subsequently to succumb, and adopt Homefinders' objectionable practices, complaints would follow and defendant could then stop receiving the advertisements. We cannot accept that the sale of rental information is an inherently and unfailingly deceptive practice, or that advertisements for such necessarily engender complaints which affect the good will of the advertising medium.

Nor can we accept defendant's apparently paternal judgment[4] that the public should not have to pay a fee to find housing. This is a matter to be resolved through the workings of the marketplace.[5] Some persons might well prefer to pay a

2. The concluding sentence in this part of the court's opinion, "It was only a matter of time before the complaints rolled in," must have been an inadvertency for "before the complaints would roll in." Even read as a prognosis, no basis was shown for it.

3. We note that the FTC's order against Homefinders, *In the Matter of Rentex, Inc., T/A Homefinders*, 1976, 87 F.T.C. 1304, referred to in our prior opinion, did not find the sale of rental information improper as a matter of principle, but was based on the subjective misconduct.

4. In a pretrial deposition, defendant gave its reasons for adopting its policy as follows.

"It was established because we had over these months and over these problems come to a conclusion that if we set up the policy it would be a good thing for our readers and also consistent with our advertisers, and dis-

cussed it with people in the business who felt that ordinary normal rental charges are sufficient for the rental agencies to receive commissions or whatever from the renter or the person owning the property, and so forth, and we didn't feel our readers should have to pay on top of the rental for this service. Also, it's apparent to us that a lot of the people who respond to advertising of Homefinders' type were those who were easily taken advantage of, people with low income, large families, disadvantaged people, blacks, and so forth, who have trouble finding rentals and would pay the fee for finding rentals because of their problems of finding suitable vacancies."

5. We have already noted in *Homefinders*, 621 F.2d, ante, at 442, that "[d]efendant is not permitted to act as a protector of the public. . . . "

small fee for a genuine list than to have to pay, indirectly, the larger brokerage commission incurred by the lessor. If, on the other hand, the public were to find plaintiff's business unsatisfying, presumably it would die a natural death. Surely no newspaper can be thought to guarantee that everything it advertises is a superlative bargain, or could claim such a standard as an anti-trust defense.

■ This is not to say that defendant was not, as a newspaper, presumptively free to choose its advertising. Defendant testified, for example, that it would not advertise handguns, or acupuncture. Absent special circumstances, it could choose not to carry any particular advertisement or type of advertising. *E.g., PMP Associates, Inc. v. Globe Newspaper Co.*, 1975, 366 Mass. 593, 321 N.E.2d 915. The difficulty here is that plaintiff alleged special circumstances. So did Homefinders. We did not reach those circumstances there because, as to that plaintiff, defendant had a legitimate business justification for rejecting the advertisements, and we would not allow Homefinders to "piggy-back on the rights of other parties." 621 F.2d, ante, at 444. Plaintiff here, however, is asserting its own rights. We turn, accordingly, to the anti-trust aspect of the case and, because the court did not reach it here, but did reach it in *Homefinders* and the record is the same, we consider the district court's findings in that case, 471 F.Supp., ante. Basic to its decision was the following.

"The evidence in the record clearly shows and this Court finds that the Defendant's decision to reject Plaintiff's advertising and to institute its policy not to accept ads from fee-charging firms was not in any way intended to restrain trade or enhance Defendant's own position in the rental information market. Indeed, there is no evidence that Defendant's pol-icy did anything other than reduce its advertising revenues. Rather, it was sound business judgment made at a financial sacrifice, intended to maintain a quality advertising section for its readers." 471 F.Supp., ante, at 422–23.

It was simply not so in *Homefinders*, or in this case, that there was no evidence that defendant's refusal to deal did anything other than reduce its advertising revenues. There was introduced on behalf of Homefinders, and reintroduced on behalf of Home Placement, extensive testimony by a qualified expert that a rental referral business is in competition with a newspaper selling more traditional forms of advertising rentals because it is "removing potential buyers of … classified advertising." Since plaintiff lists individual lessors without charge, originally and ultimately, if its service became favorably known it could siphon off lessors by saving them the cost of defendant's columns. This evidence of direct competition was uncontradicted, and given its logic, there was no basis for rejecting it. What is more, during trial, the court specifically accepted it. It interrupted plaintiff's questioning of its expert by remarking, "We have already established through this witness that [in that case, Homefinders] was competing with the Providence Journal." This is the opposite of the court's later statement that there was no evidence that defendant's foreclosing plaintiff did anything other than reduce its revenues. By this final, totally unsupported, finding, the court improperly undercut plaintiff's entire case.

Complementing the testimony about direct competition was testimony that for rental referral services the classified section of the largest metropolitan newspaper in the area is not only the primary, but the essential medium for survival. It is even required for larger transactions, sales.[6] In

---

**6.** Thus one of the state's prominent brokers testified,
> A. "We have not tried television to sell or rent a specific product or, if we have tried it, it's on a very limited basis, and the same would apply to radio, if and when we have tried it it's been on a very limited basis.

Q. "Why is that?
A. "Well, it's our opinion that the real estate purchasing segment of the public has been trained to do much of their real estate purchasing in the classified section, therefore, we respond to what we feel is the custom of the purchasing real estate public."

the geographical area to which plaintiff appealed, plaintiff's needs were such that the smaller dailies could not be sufficient. This evidence, sniped at by showing certain alleged local exceptions, but otherwise uncontradicted, indicates the simplest form of attempted strangulation of a competitor by refusal to deal. The only question is, did it give plaintiff a case. We hold that it did, under both sections 1 and 2 of the Act.

■ We believe the court's finding there was no section 1 claim for lack of a contract, combination or conspiracy in restraint of trade, was wrong as a matter of law. Shortly after defendant announced its policy, plaintiff's president, Muschiano, was told, when he called in proposed advertising copy, that plaintiff's advertisements could not be accepted. This, we agree, was in itself unilateral, and permitted by *United States v. Colgate & Co.*, 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. But matters did not end there. When told plaintiff's ads would not be accepted, Muschiano promised no longer to assess a fee in connection with properties advertised in the Journal, and on that basis, defendant agreed to resume publishing plaintiff's rental advertising.[7] The Court has repeatedly found concerted action present when it could be determined from a course of conduct that retailers agreed, in response to a manufacturer's request, or through coercion, to a manufacturer's conditions of doing business. *E.g., United States v. Parke, Davis & Co.*, 362 U.S. 29, 38–46, 80 S.Ct. 503, 508–512, 4 L.Ed.2d 505 (discussing cases); *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998. In the present case plaintiff expressly agreed to defendant's condition, viz., not to charge a fee in connection with advertised properties. Indeed, defendant could not readily implement its policy without plaintiff's agreement, it being impossible to tell from the face of an advertisement whether it required the payment of a fee. Since in the absence of defendant's policy, plaintiff would have charged a fee with respect to some of the advertised properties, a combination was formed which, in effect, fixed a maximum price of zero on plaintiff's sale of rental information. This is sufficient concerted action to bring defendant's conduct within the ambit of section 1, as it is settled that a plaintiff can claim an unlawful combination between defendant and itself as of the day it unwillingly agreed to comply with defendant's restriction. *Perma Life Mufflers, Inc. v. International Parts Corp.*, 1968, 392 U.S. 134, 142, 88 S.Ct. 1981, 1986, 20 L.Ed.2d 982; *Albrecht v. Herald Co.*, 390 U.S., ante, at 150 n.6, 88 S.Ct. at 872 n.6; see *Parke, Davis & Co.*, 362 U.S., ante, at 45 n.6, 80 S.Ct. at 512 n.6. Finally, the restraint cannot be upheld as "reasonable" when it served no legitimate business purpose, and tended not to protect, but to destroy, competition. *Cf. Chicago Board of Trade v. United States*, 1918, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683.

While we consider the court erred in holding that section 1 had not been violated, if, possibly, there could be a question of fact here, there can be none with respect to section 2. The evidence fully supported plaintiff's theory, as viewed by the court, that "the Journal was using its dominance in the newspaper advertising market to foreclose competition in the housing vacancy information market." Although the court found defendant lacked monopoly power, the record was to the contrary. To some extent, plaintiff helped to misdirect the court by attempting to prove that defendant monopolized the sale of newspapers and classified advertising throughout the Providence-Pawtucket-Warwick SMSA, an area consisting of much of central and northern Rhode Island, and parts of southern Massachusetts. We tend to agree that even in this larger market the court's finding no monopoly was not supported by the evidence, but there was no need to define either the product, or the geographic market, so broadly.

---

**7.** The court made no findings in this regard, but these facts are undisputed. Corroborating Muschiano's testimony as to these events, a memo written by defendant's Manager of Classified Advertising states that Muschiano

"informed me that his organization was no longer going to charge a fee for rental referrals or rental information service."
"I told him at this time he could begin running his rental advertising again."

■ The relevant market is "the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market." Sullivan, Antitrust 41 (1977). Or, as the Court has put it, "[C]ommodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." *United States v. E. I. DuPont de Nemours & Co.*, 1956, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264. *See generally George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 1 Cir., 1974, 508 F.2d 547, *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673. Thus, the relevant product is not all advertising, or even all classified advertising, but merely daily newspaper rental advertising. Defendant offered no rebuttal of plaintiff's substantial evidence, through numerous witnesses, that there was no effective substitute therefor. The court's reference to the alternatives of "radio, television, [and] billboard," overlooked the uncontradicted testimony of experts, and those in the business, that these are effective only for institutional advertising, in conjunction with, but not in substitution for, more specific daily newspaper ads. Nor are weekly newspapers an adequate substitute, precisely because they offer competition only once a week. In short, on the evidence, none of the alternative media identified by the court could be said to be "reasonably interchangeable" with, or competing "on substantial parity" with, the rental columns of daily newspapers.

■ As for the geographic bounds of the market, the court found that defendant maintained a circulation advantage of 152,-379 to 5,846 within the so-called Providence City Zone, consisting of Providence and ten surrounding communities, including Warwick, Cranston, and, significantly, West Warwick, where plaintiff was situated. It has not been disputed, nor could it be, that within this zone defendant had a monopoly over the sale of newspapers. *See Lorain Journal v. United States*, 1951, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162. Correspondingly, though the court did not pass on the matter, the evidence compels the conclusion that defendant had monopoly power in the sale of newspaper advertising for rental units located within the City Zone. The only daily newspapers allegedly competing with defendant for rental listings were smaller, local papers scattered about, mostly outside the City Zone, notably in Pawtucket and Woonsocket, Rhode Island, and Attleboro, Massachusetts. All of these combined accounted for a market share of 25 per cent, compared to the Journal's 75 per cent, in the Providence-Pawtucket-Warwick SMSA. Whatever advertising competition these locals offered in their respective areas, they were not effectively competing with the Journal, individually or collectively, for the advertisement of property located with the City Zone. Broker and expert testimony confirmed that the owner of property in Providence or Warwick would not consider it a viable alternative to the Journal to advertise exclusively in, say, the Woonsocket Call, or, for that matter, to pay the greater expense of advertising in several, or all, of the locals, when none had any significant readership in the general area where the property was located. That the Journal could hike its classified advertising prices without fear of competition from the locals is reflected by the fact that defendant was charging substantially higher rates for a line of advertising than any of these alleged competitors.

The court's only response, that "there is no evidence to support in any fashion the contention that [the City Zone] is an existing submarket for renter information," misses the point. The purpose of market definitions is not to frustrate anti-trust plaintiffs by requiring the proof of bright lines which do not exist, but is to help identify monopoly power, that is, "the power to control prices or exclude competition." *United States v. E. I. DuPont de Nemours & Co.*, 351 U.S., ante, at 391, 76 S.Ct. at 1004. The breadth with which one defined the "submarket for renter information" could not possibly hide the fact that within the City Zone, defendant had an uncontested lock on the sale of rental listings. Plain-

tiff's case is not defeated by showing that some readers outside the City Zone might be interested in renting within it. As plaintiff's expert testified, utilizing the locals to reach these readers would not provide "any meaningful circulation within your market area that you're trying to do business in." It would be "leaving out your primary area of doing business, and trying to hit markets that surround your area of doing business," whereas, with the Journal, "you're hitting your primary market area rather than all of these peripheral areas." Again, this testimony was unrebutted, and, again, there was no basis for disregarding it. In sum, the only reasonable conclusion to be drawn from the evidence was that with respect to the sale of rental advertising within the City Zone defendant was a monopolist.

■■■ Defendant's second, alternative, line of defense, also adopted by the court, was that whatever monopoly power it possessed had not been used unlawfully. This, too, we find erroneous. As previously discussed, firms such as plaintiff posed a potential threat to defendant's monopoly position. If plaintiff were successful, it could siphon off defendant's advertisers, and essentially redefine the market for the listing of rental information, thereby perhaps forcing defendant to lower its advertising prices. Because of its monopoly over rental listings in the general area where plaintiff was attempting to operate, the Journal's refusal to run ads where a fee was charged put plaintiff out of the rental referral business. We have held that this refusal was not supported by a legitimate business reason. In the absence of such, defendant's use of monopoly power to destroy a potential competitor was a violation of section 2. *E.g., Lorain Journal v. United States*, ante; *Gamco, Inc. v. Providence Fruit & Produce Building, Inc.*, 1 Cir., 1952, 194 F.2d 484, cert. denied, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636. It makes no difference that defendant's motives may be claimed to have been pure. Specific intent is necessary only when an attempt to monopolize is alleged. *See Times-Picayune Pub. Co. v. United States*, 1953, 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277. Lack of bad purpose is irrelevant where the defendant already possesses monopoly power and, without justification, uses it to exclude competition. *United States v. Griffith*, 1948, 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236. *Byars v. Bluff City News Co.*, 6 Cir., 1979, 609 F.2d 843. We agree with the court in *Byars* that "what should matter is not the monopolist's state of mind, but the overall impact of the monopolist's practices." *Id.* at 860. When the foreseeable and proximate consequence of defendant's conduct was unreasonably to perpetuate an already existing monopoly by excluding a potential competitor, it would be of no solace to plaintiff, or the consumers the anti-trust laws were designed to protect, that defendant may not have been seeking this result.

Plaintiff sought relief in the form of treble damages, attorney's fees, and an injunction. Further proceedings will be necessary to determine the appropriate form of injunctive relief, if any is needed, and the amount owing in damages and attorney's fees.[8] We add that this is a case where it would be easier all around, including for the judge himself, without any possible reflection on him, to have the further proceedings before another trier. Our reasoning on this subject is set out in *O'Shea v. United States*, 1974, 491 F.2d 774, 778–79. This is an automatic rule in some other districts, but, in case it is not in Rhode Island, we so request here.

*Reversed and remanded for further proceedings consistent herewith.*

8. We offer no opinion on whether plaintiff's claim for damages might have been waived.