The INTERFACE GROUP,
INC., Plaintiff,

v.

GORDON PUBLICATIONS,
INC., Defendant.

Civ. A. No. 83–92–G.

United States District Court,
D. Massachusetts.

April 25, 1983.

Earle C. Cooley, Hale & Dorr, Boston, Mass., for plaintiff.

R. Robert Popeo, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION

SKINNER, District Judge.

The plaintiff, The Interface Group, Inc. (Interface), is a Massachusetts corporation which is in the business of producing computer and communications conferences, trade shows, and expositions in the United States and abroad. Plaintiff brought this suit for preliminary injunctive relief and a declaratory judgment under 28 U.S.C. §§ 2201 and 2202. The defendant, Gordon Publications, Inc. (Gordon), is the publisher of some 15 specialty trade magazines, three of which, *Computer Dealer, Computer Products,* and *Software Retailing,* are specifically directed to the computer trade. The plaintiff wants to keep the defendant from selling or distributing a "show daily" from the exhibition floor of any of plaintiff's shows unless the defendant and the plaintiff enter into a contract which authorizes the defendant to do so. The defendant filed an answer and a counterclaim, alleging that the defendant has a contract right to distribute defendant's show daily at plaintiff's exhibitions and alleging that plaintiff's efforts to exclude the defendant constitute violations of the United States antitrust laws and the Massachusetts law proscribing unfair methods of competition.

For the past few weeks, the parties have been engaged in a process of expedited discovery so this court would have the opportunity to rule on a motion for a preliminary injunction before the plaintiff's upcoming trade show, Comdex/Spring '83, which will be held at the Georgia World Congress Center in Atlanta, Georgia, April 26–29, 1983. At this point in the proceedings, the court has before it defendant's

motion for a preliminary injunction. Both parties have submitted extensive filings in support of their respective positions and the court heard oral argument on April 20, 1983.

The Comdex shows, or Computer Dealer Exhibition shows, are a series of computer trade shows sponsored by Interface at which most of the exhibitors are manufacturers or other suppliers of computers or computer-related products. These exhibitors will be there to sell to the show attendees. The attendees or buyers are not individual consumers buying personal home computers, but rather are resellers, which include independent sales organizations such as dealers, distributors, systems houses, computer retailers, turnkey vendors, value adders, mass merchandisers, and others. Interface sponsored the first Comdex show late in 1979 and now sponsors three Comdex shows each year. Two are held in the United States and one is held in Europe. The largest show is Comdex/Fall, which this year was held in Las Vegas, Nevada. The next largest show is Comdex/Spring, which is held annually in a city in the eastern United States. The first Comdex/Europe was held last year in Amsterdam, The Netherlands, and Comdex/Europe '83 is also scheduled to be held in Amsterdam.

In addition to the exhibitors who purchase booth space so they can sell computers and computer products, some of the purchasers of Comdex booths are publishers of computer trade magazines. The defendant, Gordon Publications, Inc., is in the business of publishing business and technical trade journals for several technical fields, such as biology, metallurgy, and, of course, computers. Gordon has participated as an exhibitor at every single one of Interface's Comdex shows since Interface started producing the Comdex series in 1979. At the shows, Gordon distributes its three computer journals: *Computer Dealer, Computer Products,* and *Software Retailing.* In addition, ever since the second Comdex show, Comdex/Spring '80, Gordon has published and distributed a "show daily" as part of its Comdex exhibit.

A "show daily" resembles a program for a trade show. It contains information about the exposition, the exhibitors, and the happenings at the show and in the industry. It is also filled with advertising. Show dailies contain advertising both from the exhibitors concerning their company and their wares and from area hotels and other merchants concerning services in the city where the exposition is held. In the computer trade show industry, show dailies, including Gordon's, are distributed free of charge to the people who attend the shows, and the advertising revenue covers the costs of writing, printing, and distributing the publication. Gordon's show dailies are tabloid newspapers which contain articles about trade developments, product announcements, and information about the show. In addition, Gordon's show daily is filled with advertising, mostly by exhibitors in the show. The advertisements stay the same throughout the show, but the articles are changed slightly so a different edition of the show daily is distributed each day of the show. The show dailies distributed by Gordon in Las Vegas were 168 pages in length. Almost every page contained advertising and approximately 100 pages contained only advertising. Gordon sold all of that advertising space and distributed thousands of free copies.

Gordon uses its show daily as an inducement to the industry to advertise in its principal computer trade publication, *Computer Dealer,* by offering reduced rates in the show daily to advertisers in *Computer Dealer.* Gordon sets its show daily advertising rates below the prevailing market rate for other computer trade publications, including other show dailies in the computer trade.

From Comdex/Spring '80 through and including Comdex/Spring '82, Interface allowed and even encouraged Gordon to publish and distribute its show daily. Interface, as the management of these trade shows, supplied much of the information about the show and the exhibitors which became the editorial and news content of Gordon's show dailies.

Over the years, the Comdex shows grew. From 157 exhibitors and 2100 attendees at Comdex/Fall '79, the show has grown to 1106 exhibitors and 30,500 attendees at Comdex/Fall '82. Over the same period, advertising in Gordon's show dailies has grown. From Spring, 1980 through Spring, 1982 Gordon was the only firm distributing a show daily at Comdex shows and, as a result, as the show audience grew and Gordon's distribution and circulation grew with it, advertisers became more interested in advertising in Gordon's show daily, a publication that would be distributed to all who attended. For example, Gordon grossed $105,000 in advertising revenue for its show dailies which were distributed at Comdex/Fall '82 in Las Vegas.

During 1982 a dispute developed between the parties, resulting in this litigation. It was the view of Sheldon Adelson, President of Interface, that because Gordon was distributing its show daily on premises leased by Interface to an audience assembled through Interface's efforts, Interface was entitled to a share of the show daily revenue. Interface told Gordon that Interface would not agree to allow Gordon to distribute its show dailies at future Comdex shows unless Gordon agreed to pay Interface 25 to 30% of the gross show daily advertising revenue. Gordon refused.

On October 15, 1982 Interface returned Gordon's application and deposit for an exhibit booth at the Comdex/Europe '82 show in Amsterdam, which was held November 8–11, 1982. In November, 1982 Interface rejected Gordon's applications for exhibit space at the Comdex/Fall '82 and Comdex/Spring '83 expositions. The Comdex/Europe '82 and Comdex/Fall '82 shows were held and Gordon attempted, with varying degrees of success, to distribute its show daily at these shows, despite Interface's refusal to license such distribution or to sell Gordon exhibit space. There were court cases in Amsterdam and Las Vegas concerning distribution of Gordon's show dailies at these shows. Gordon alleges that in addition to seeking to keep Gordon from distributing its show dailies in the Comdex exhibition halls, Interface interfered with

Gordon's distribution of show dailies from hotels in Amsterdam and Las Vegas.

Interface has refused to accept Gordon's application for an exhibit booth at Comdex/Spring '83 in Atlanta, so Gordon will not be allowed to distribute its show daily or its three computer magazines from the exhibition floor in Atlanta if an injunction does not issue. Whether or not Gordon is allowed to distribute show dailies from the exhibition floor, Gordon has arranged to distribute its show dailies from hotels and other areas in Atlanta where Gordon might reach those attending the exposition without entering premises leased by Interface to do so.

In addition, Interface has decided to enter the market and will be publishing and distributing its own show daily at the Comdex/Spring '83 exposition. All of the advertising for both plaintiff's and defendant's show dailies has already been solicited, and both parties are ready to go to print with their respective publications.

Gordon seeks a preliminary injunction preventing Interface from keeping Gordon's show daily off the exhibition floor. In order for Gordon to prevail, the court must find that Gordon has satisfied four criteria:

> (1) that [Gordon] will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on [Interface]; (3) that [Gordon] has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Auburn News Co., Inc. v. Providence Journal Co.,* 659 F.2d 273, 277 (1st Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982) (citation omitted). *See also* Section 16 of the Clayton Act, 15 U.S.C. § 26.

■ I turn first to assess the likelihood of success of Gordon's contract and antitrust claims. The evidence shows that companies wishing to participate in an Interface exposition must complete an application form for that exposition. The application form

states that no contract for exhibit space exists until Interface accepts the application in writing. Interface literature explains the AO Procedure, a first-come, first-served, priority system. AO stands for assignment order and the AO procedure provides that exhibit booth space at Comdex shows will be assigned on the basis of how many prior shows the exhibitor has attended.

For example, under the AO procedure, the first exhibitor at the first Comdex show would be given AO priority number 1 (one). As long as he paid his exhibit rental fee on time, kept his contractual commitments, and did not miss two consecutive shows, he would keep AO priority number 1 (one). Exhibitors are allowed to select which exhibit booths they want to occupy at each show on the basis of their respective AO priority numbers. The holder of AO priority number 1 (one) gets his first choice concerning which exhibit booth he wants. Gordon contends that its prior contracts, course of dealing, and the AO procedure have given Gordon an option or a contract right to participate in all future Comdex shows. Interface contends that the AO procedure simply establishes what an exhibitor's selection priority will be *if* Interface agrees to enter into a contract renting an exhibition booth to that exhibitor. In my view, Gordon is not likely to succeed on the merits of this contract claim.

Gordon further contends that by refusing to sell Gordon an exhibit booth, Interface is violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

■ Gordon's Section 1 claim is that Interface contacted hotels in Las Vegas and Amsterdam to convince them to prohibit Gordon from distributing show dailies from their hotels and these communications coupled with concerted action establish a concerted refusal to deal. *See Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1966); *Fashion Originator's Guild of America v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). However, Gordon has not produced any evidence that this conduct, even if it took place

as alleged, is likely to continue at future Comdex expositions. Rather, all evidence is to the contrary. Interface has acknowledged that Interface has no right to interfere with Gordon's distribution of its show dailies at hotels and all other areas which have not been leased by Interface. Therefore, since Gordon will be entitled to treble damages, costs and a reasonable attorneys' fee if it proves at trial that Interface engaged in such conduct and that conduct was a violation of Sherman Act § 1 and caused Gordon damages, because there is no immediate danger of irreparable loss or damage, Gordon's Section 1 allegations do not merit preliminary injunctive relief. *See* Clayton Act §§ 4 and 16, 15 U.S.C. §§ 15, 26.

■ Gordon also contends that Interface's unilateral refusal to sell exhibition space to Gordon violates Section 2 of the Sherman Act. Gordon has outlined four separate theories under which it believes that Interface's conduct violates the Section 2 proscriptions against monopolization and attempts to monopolize. Interface's conduct is challenged as: (1) an attempt to monopolize, (2) an unlawful exclusion of Gordon from an essential facility, (3) use or leverage of monopoly power in one market to foreclose competition in another market, and (4) an effort by Interface to extend or abuse its monopoly power.

The purpose of the prohibitions of Section 2 of the Sherman Act is to go beyond Section 1's proscription of contracts, combinations, or conspiracies in restraint of trade, which applies to conduct by two or more actors, in order to proscribe conduct by a single economic entity which may stifle competition. *See Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 272 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). The first step in this court's analysis of a claim of monopolization or an attempt to monopolize must be an examination of the relevant market to determine if Interface's conduct is likely to affect competition adversely. *See, e.g., United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391–393, 76 S.Ct. 994, 1004–06, 100 L.Ed. 1264 (1956);

*Home Placement Service, Inc. v. Providence Journal Co.,* 682 F.2d 274, 278–281 (1st Cir. 1982).

■ The Court of Appeals defines a relevant market as "the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market." *Home Placement Service, Inc. v. Providence Journal Co.,* 682 F.2d at 280, *quoting* L. Sullivan, Handbook of the Law of Antitrust 41 (1977). Applying that standard and the Supreme Court's "reasonable interchangeability" formulation to this case, *see United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), it appears that the relevant product market is not show dailies at Comdex shows as Gordon suggests, but rather is advertising in computer trade publications which have a substantial circulation to independent sales organizations (ISO's), original equipment manufacturers (OEM's) and other firms which are in the market for the products hawked at Comdex shows.

It is important that show dailies are not sold to the people who attend trade shows. The attendees are not the buyers and the show dailies are not the product. Rather, the product in this case is advertising space in a computer publication which will be distributed to the people who attend Interface's Comdex expositions. The critical question is whether the advertisers who buy space in the show dailies believe that advertising by other means is not a reasonable substitute for advertising in a show daily. Compare the *Home Placement* case, for example, wherein the Court of Appeals explained that weekly newspapers were not an adequate substitute for daily newspapers when the product being advertised was rental property, and therefore daily newspaper rental advertising was the relevant market. Rental properties went on and off the market daily and renters needed an up-to-date listing of what properties were available in this volatile market. Therefore, firms and individuals who advertised rental property did not perceive daily and weekly newspapers as "reasonably interchangeable." *Home Placement Service v. Providence Journal Co.,* 682 F.2d at 280. In this case, however, the evidence suggests that the relevant product market is broader.

There is significant evidence that show dailies are included in this broader computer dealer trade publication advertising market and do not constitute a relevant submarket. First, Interface's show daily editor set the advertising rates for Interface's show daily by reference to the rates charged by other computer trade publications. This demonstrates his perception that his rates had to be competitive with the rates for advertising in other trade publications; otherwise, the advertisers would not purchase ads in his publication. Second, the same advertisers who advertised in Gordon's computer trade publications, such as *Computer Dealer,* also advertised in Gordon's show daily. Both show daily ads and ads in other computer trade publications identify the advertiser, its products, and extol its products' virtues. Advertisers often place the same ad in show dailies and other computer trade publications, such as Gordon's *Computer Dealer.* Both media also circulate to the same audience; many trade publications develop their mailing lists by referring to lists of those who exhibit at or attend trade shows. Third, while the minor daily updating of the "news" content of the show dailies may have been peripherally interesting to the attendees at Comdex shows, there has been insufficient evidence submitted that this daily updating affected the advertisers. There was no daily updating of advertisements. The ads ran in all three editions of the show daily. All of the ads for the upcoming Comdex/Spring '83 show have already been placed. Therefore, unlike the *Home Placement* case in which daily newspapers gave rental advertisers a chance to inform the public about rental availability on a day-to-day basis, show daily advertisements are submitted well in advance, as are ads in other computer trade publications. Fourth, Gordon's advertisements in its own

show dailies evidence that several of its publications are sent to the same organizations which attend Comdex shows. In addition, while the primary advertisers in show dailies are the exhibitors, only 12% of the Comdex/Fall '82 exhibitors advertised in Gordon's show daily; the other 88% evidently spent their advertising dollars elsewhere. Fifth, Gordon reports that some of the advertisers who had placed ads in Gordon's *Computer Dealer* publication pulled their ads when they learned Gordon might not be allowed to distribute *Computer Dealer* at Comdex/Spring '83. This is because advertisers do not just reach the people who attend trade shows through show dailies. They also reach the people who attend these shows through the other computer trade publications distributed at the shows. The evidence presented to this point indicates that *Computer Dealer* and show dailies are in the same market, the market for advertising in computer dealer trade publications. Gordon believes the computer dealer trade publication market is very competitive and its expert, Professor Cady of the Harvard Business School, agrees with that assessment. Therefore, in my view, Interface's show daily is entering a very competitive *product* market in which Interface will have a very small market share and will compete with many other computer trade publications for advertising revenue.

Similarly, since there are non-Comdex trade shows which are attended by many of the same people who attend the Comdex shows and many OEM's and ISO's which do not attend the Comdex shows,[1] I find that Gordon has not shown that show dailies distributed at these other competing trade shows are not in the same relevant *geographic* market as show dailies distributed at Comdex shows.

Gordon is of course correct that show dailies distributed at Comdex shows are a very valuable marketing device for those trying to reach independent computer sales organizations and other computer dealers because show dailies can be distributed at low cost to a large group of people whom the advertiser wants to reach. Similarly, a program distributed at theatres is a valuable marketing vehicle, what Gordon calls a "rifle shot," for advertisers who wish to reach patrons of the theatre. However, there are other ways to contact patrons of the theatre to inform them about products they may wish to purchase and these other advertising methods are included in the same relevant market if they are reasonably interchangeable substitutes which sufficiently limit the market power of the firm distributing the program. *See* 2 P. Areeda & D. Turner, Antitrust Law ¶ 518 (1978). There are also other ways to reach computer dealers. In my view, at this stage of the proceedings, the best evidence argues for a product market which includes, at a minimum, computer dealer trade publications.

Gordon also claims that Interface is attempting to monopolize in violation of Section 2 of the Sherman Act. To establish a likelihood of prevailing on the merits of this claim, Gordon must demonstrate that Interface acted with specific intent to achieve a monopoly position in a relevant market and that there is a dangerous probability that Interface will succeed. *See American Tobacco Co. v. United States,* 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946); *United States v. Empire Gas Corp.,* 537 F.2d 296, 298–299 (8th Cir.1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). Gordon has not produced sufficient evidence that there is a dangerous probability that Interface will monopolize a relevant market.

Gordon argues that the fact that Interface's advertising rates for ads placed in its show daily are five times the rates charged by Gordon shows that by excluding Gordon Interface has achieved a monopoly position and is charging monopoly prices. However, the evidence is that Interface has set a competitive price to compete with advertising in other trade publications. Gordon's lower prices reflect Gordon's marketing strategy to use its show daily to attract advertising in its other publications, in ef-

---

1. *See* discussion of trade show monopoly *infra.*

fect, using the show daily something like a "loss leader." *See, e.g., Lormar v. Kroger Co.,* 1979 Trade Cas. ¶ 62498 (S.D.Ohio 1979). Under Gordon's analysis, before Interface entered the show daily business Gordon had a monopoly position and could have charged very high advertising rates. Yet, even at that time Gordon charged less than the prevailing market rates. Therefore, a comparison between the rates charged by Interface and Gordon for show daily advertising does not demonstrate that Interface is earning monopoly profits.

■ Gordon's second Section 2 theory is based on the "essential facility doctrine" or "bottleneck analysis" outlined by the Supreme Court in *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) and anticipated by our Court of Appeals twenty-one years earlier in *Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc.,* 194 F.2d 484 (1st Cir. 1952). As a general rule, a company has the unfettered right to deal with whom it pleases and to refuse to deal with whom it pleases, so long as the determination is made unilaterally. *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843, 854 (6th Cir. 1979); *Associated Press v. United States,* 326 U.S. 1, 14–15, 65 S.Ct. 1416, 1421–22, 89 L.Ed. 2013 (1945); *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). Courts must not yield to the "long resisted temptation to create a federal common law of unfair competition." *George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.,* 508 F.2d 547, 560 (1st Cir.1974) (citation omitted), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). "The purpose of the Sherman Act ... is not to maintain friendly business relations among firms in the same industry nor was it designed to keep these firms happy and gleeful." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 291 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (citation omitted).

■ In some circumstances, however, under the *Otter Tail* case, a monopolist who controls a facility, access to which is essential for a competitor to enter a market, may be under a duty to make the facility accessible. When an essential facility exists, the firm that controls the facility can block access to the market by excluding competitors. *See generally* Note, Refusals to Deal by Vertically Integrated Monopolists, 87 Harv.L.Rev. 1720, 1740–1752 (1974).

Gordon has not demonstrated a likelihood of prevailing on this theory for two reasons. First, Gordon has not made a sufficient showing that Interface has monopoly power in the computer trade show industry. *The Sizzle Sheet,* a computer publication, identifies approximately 200 computer and computer-related trade shows scheduled for 1983 in its "1983 Information Trade Show Calendar." Gordon contends that Comdex shows are "unique" dealer-to-dealer shows, unlike all the other computer trade shows. However, examination of *The Sizzle Sheet*'s calendar demonstrates that while the Comdex shows may be the largest, there are approximately one hundred other computer trade shows which are attended by ISO's, OEM's, and other dealers. There is significant evidence that the trade show industry in general is growing extremely quickly and computer-related shows are the fastest-growing segment. While Gordon's experts may prove to be correct that there are some economies of scale in the computer trade show market, there is also evidence that there are diseconomies of scale and if a show tries to grow too large it may lose some business. *See* P. Alker, For Convergent, Comdex is Too Big to Be Effective, in Computer System News 91 (March 14, 1983) (Exhibit E to Affidavit of Sheldon G. Adelson). A survey conducted by Gordon's own *Computer Dealer* magazine found that only 44.1% of the dealers responding attended Comdex shows, 61.2% attend the NCC show, 15.5% attend the NOMDA show, and 44.9% attend other shows (Exhibit F to Affidavit of Sheldon G. Adelson). Therefore, a sufficient showing of Interface's monopoly power has not been presented.

In addition, there has not yet been a sufficient showing that the Comdex show is an "essential facility" for a firm in the business of selling advertising space in com-

puter trade publications. In my view, this is not the same type of case as those relied upon by Gordon. In *United States v. Terminal R.R. Assoc. of St. Louis,* 224 U.S. 383, 393, 32 S.Ct. 507, 509, 56 L.Ed. 810 (1912), the defendant railroads gained control of all railroad switching facilities in St. Louis "to obtain the control of every feasible means of railroad access to St. Louis." Despite Professor Cady's characterization of Comdex as a "market maker" or a computer "exchange," excluding a publisher of computer trade magazines from a Comdex show is not the same as excluding a securities broker-dealer from access to the New York Stock Exchange as in *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). Similarly, this is not a case like *Gamco Inc. v. Providence Fruit & Produce Bldg., Inc.,* 194 F.2d 484 (1st Cir.1952), in which the defendants excluded the plaintiff, a Providence, Rhode Island buyer and reseller of produce, from access to the Providence produce building. The produce building was adjacent to the Providence Railroad Station's main freight lines and all local produce trade was centered in the building. The Court of Appeals in that case found that to exclude Gamco from the Produce Building would effectively exclude him from the Providence produce market. In this case, given that there are many other shows and Interface does not control access to the market, Gordon has not made a sufficient showing that the essential facility doctrine is applicable.

Gordon's final two Section 2 theories, that Interface leveraged monopoly power in one market to foreclose competition in another and that exclusion of Gordon was an effort by Interface to abuse or extend its monopoly power, both require a showing that Interface has monopoly power or is likely to obtain monopoly power in the computer trade show market. *See, e.g., United States v. Griffith,* 334 U.S. 100, 105–108, 68 S.Ct. 941, 944–46, 92 L.Ed. 1236 (1948); *Gamco,* 194 F.2d at 486–487; *Berkey Photo,* 603 F.2d at 275; *Home Placement,* 682 F.2d at 281. Because it is my view that Gordon is not likely to be able to establish that Interface possessed or will possess such mo-

nopoly power, I do not believe Gordon is likely to prevail on the merits under either of these theories.

With respect to Gordon's antitrust claims under state law, I reach the same result: Gordon is not likely to prevail on the merits. As Gordon points out, the Massachusetts unfair competition act is to be construed consistently with the interpretations given by federal courts and the Federal Trade Commission in construing § 5(a)(1) of the Federal Trade Commission Act. *See* M.G.L. c. 93A, § 2(b). The Federal Trade Commission Act is somewhat broader than the Sherman Act and the Supreme Court has said that the Federal Trade Commission Act prohibits incipient violations of the Sherman Act and the Clayton Act as well as some practices which violate neither the letter nor the spirit of the antitrust laws. *See FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 239, 92 S.Ct. 898, 903, 31 L.Ed.2d 710 (1972). However, to violate the Federal Trade Commission Act or the Massachusetts statute, a practice must be unfair, immoral, oppressive, unethical, unscrupulous, or cause substantial injury to consumers or competitors. *See PMP Associates, Inc. v. Globe Newspaper Co.,* 366 Mass. 593, 321 N.E.2d 915 (1975); *FTC v. Sperry Hutchinson Co., supra.*

Gordon has not made a sufficient showing that the state antitrust laws should be interpreted to prohibit unilateral refusals to deal by non-monopolists. The Massachusetts Supreme Judicial Court, in one of the principal cases relied upon by Gordon, stated:

Although most of the "refusal to deal: cases have arisen under the anti-trust acts, the analysis therein is applicable to the instant case.... "Refusals to sell, without more, do not violate the law." *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 625 [73 S.Ct. 872, 889, 97 L.Ed. 1277] (1953). In each of these cases, the court emphasized that more than a mere refusal to deal would be required to violate the Federal acts.... [I]t is the right of one engaged in private business to refuse to deal, or

discontinue dealing, with anyone, for any reason, unless the dealer combines with others in a concerted effort to hinder free trade.

*PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. at 597, 321 N.E.2d 915 (citations omitted). *Compare Auburn News Company, Inc. v. Providence Journal Co.*, 659 F.2d at 278. Gordon has not shown that Interface's refusal to deal or its decision to replace Gordon's show daily with its own show daily as the exclusive show daily at Comdex shows will affect competition adversely. Similarly, there has been no showing that it was in any sense unfair, immoral, oppressive, unethical or unscrupulous for Interface to refuse to enter into a contract selling Gordon booth space at upcoming Comdex shows when Interface gave Gordon notice well in advance that its application would not be accepted. Gordon has not demonstrated that Massachusetts law prohibits such conduct. *See also* P. Areeda, Antitrust Analysis 832–834 (3d Ed.1981).

It is therefore my view that Gordon is not likely to prevail on either its state or federal antitrust claims, so preliminary injunctive relief should not be granted. In addition, Gordon has not demonstrated that relief at law would be inadequate. Should Gordon prevail at trial, treble damages, attorneys' fees and costs would be an adequate remedy. Gordon's main argument in support of its contention that damages would be an inadequate remedy is based on Professor Cady's statement that if Gordon loses market share during the pendency of this suit Gordon will lose credibility with its advertisers and will be unable to recover that market share. However, the only reason Gordon gives for this loss of credibility is that the advertisers will see that Gordon is not distributing its show daily at Comdex shows. If this court orders Interface to sell Gordon booth space at future shows, Gordon will be able to use this court's orders as assurance to advertisers that Gordon will be present at future shows. Therefore, Gordon has not given this court any reason to believe that under the facts of this case it would be difficult for Gordon to regain its market share. Gordon has not shown that

it will suffer irreparable injury if the injunction is not granted.

Accordingly, Gordon's motion for preliminary injunction is DENIED.